*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0401P (6th Cir.)
File Name: 03a0401p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CAROLYN CARTER,
  *Plaintiff-Appellant,*

  *v.*

UNIVERSITY OF TOLEDO,
  *Defendant-Appellee.*

No. 02-3842

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 01-07307—David A. Katz, District Judge.

Argued: October 22, 2003

Decided and Filed: November 12, 2003

Before: KEITH, DAUGHTREY, and GILMAN, Circuit
Judges.

---

**COUNSEL**

**ARGUED:** John D. Franklin, LAW OFFICES OF JOHN D.
FRANKLIN & ASSOCIATES, Toledo, Ohio, for Appellant.
Cheryl F. Wolff, SPENGLER NATHANSON, Toledo, Ohio,
for Appellee. **ON BRIEF:** John D. Franklin, LAW
OFFICES OF JOHN D. FRANKLIN & ASSOCIATES,
Toledo, Ohio, for Appellant. Cheryl F. Wolff, Theodore M.

Rowen, SPENGLER NATHANSON, Toledo, Ohio, for
Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Dr. Carolyn
Carter, who is African-American, brought suit against her
former employer, the University of Toledo, alleging that the
University failed to renew her contract as a visiting professor
because of her race. The district court granted the
University's motion for summary judgment, concluding that
Carter had failed to show any direct evidence of
discrimination and had also failed to establish that the
legitimate, nondiscriminatory reasons given by the University
for not renewing her contract were a pretext to disguise racial
discrimination. For the reasons set forth below, we
**REVERSE** the judgment of the district court and **REMAND**
for further proceedings consistent with this opinion.

## I. BACKGROUND

The University of Toledo hired Carter in January of 1996
as an Assistant Professor of Curriculum and Instruction in the
University's College of Education. Carter's assistant
professorship was a tenure-track faculty position. In October
of 1996, the University's Personnel Committee recognized
Carter as having shown "good progress in her teaching,
professional activities and service." The Personnel
Committee unanimously recommended that her faculty
appointment be renewed. Professor James R. Gress, the
chairman of Carter's department, echoed the Committee's
sentiments in his support for Carter's reappointment.

As a result of these favorable recommendations, the
University renewed Carter's appointment for two years and
awarded her a merit pay increase. Carter, however,

voluntarily resigned from her tenure-track faculty position in May of 1997 to take an administrative position in the Jackson, Michigan school district. She left the University in July of 1997 after teaching the first of the summer school sessions.

Due to another change in career plans, Carter returned to the University of Toledo as a visiting faculty member for the 1999-2000 academic year. Dr. Charlene Czerniak, who was then Interim Dean of the College of Education, extended Carter an offer for the visiting professorship in the Educational Administration and Supervision (EDAS) program in the College of Education's Department of Foundations and Leadership. Carter accepted the appointment in the EDAS program, as did three other visiting professors—Louis Barsi, Brenda Lanclos, and Richard St. John—who were all Caucasian.

The University did not renew Carter's visiting-professor appointment after the 1999-2000 academic year. In July of 2000, Carter sent an e-mail message to Czerniak inquiring about the renewal of her contract with the University for the following year. Czerniak responded that the University had met its hiring needs for the year and would not be extending Carter's appointment.

Carter was not the only visiting professor whose contract was not renewed for the 2000-2001 academic year. Neither St. John, who like Carter was teaching in the EDAS program, nor Mary Anne Stibbe, a visiting professor in the College of Education's Department of Curriculum and Psychological Studies, were reappointed for 2000-2001. Both St. John and Stibbe are Caucasian.

Barsi and Lanclos, the other two EDAS visiting professors, were rehired for the following academic year, but not in the EDAS program. Three new visiting professors were hired in the EDAS program for the 2000-2001 academic year. One was Bunk Adams, who is African-American, and the other

two were Sandra McKinley and Robin Rayfield, both Caucasian.

When she had not heard anything about the renewal of her visiting professorship, Carter contacted Dr. Earl Murry, the University's Vice Provost. Murry's duties as Vice Provost included acting as chief negotiator for the faculty's collective bargaining agreements, coordinating faculty recruiting, hiring, training, and orientation, advising the Provost on tenure and promotions, reviewing salary matters, and ensuring compliance with affirmative action requirements. According to Carter, Murry said that he would investigate the matter and get back to her. When Murry did not promptly get in touch with Carter, she called him back to ask whether he had any information about the renewal of her contract.

Murry told Carter that he had not yet discussed the issue with Czerniak, and then, according to Carter, volunteered that "[Czerniak] is trying to whitewash the college of education and I am not going to let her do this." Carter also asserts that Murry "told me that [Czerniak] was trying to get rid of the black professors and that he was in a struggle with her involving the appointment of an additional black professor." When she contacted him a third time to find out whether her appointment would be renewed, Carter claims that Murry said "I don't know what's going on, they're a bunch of racists over there." Murry denies making any of these statements.

Carter sued the University of Toledo in June of 2001. She alleged that the University discriminated against her because of her race in violation of 42 U.S.C. §§ 2000(e)-2000(e)-17 (Title VII), 42 U.S.C. § 1981, and Ohio Revised Code § 4112.02 and § 4112.99. Carter also claimed that the University subjected her to a racially hostile work environment in violation of Title VII and Ohio law. The University moved for summary judgment, arguing that Carter had failed to present either direct or circumstantial evidence of racial discrimination, and asserting that her hostile work

environment claims were without merit because she had not presented any evidence supporting these claims.

In June of 2002, the district court granted the University's motion for summary judgment. Carter filed a timely appeal. In her briefs on appeal, however, Carter does not address the district court's ruling on her claims of a racially hostile work environment. We therefore consider those arguments waived. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 544 n.8 (6th Cir. 2002) ("It is well established that an issue not raised in a party's briefs may be deemed waived.").

## II.  ANALYSIS

### A.  Standard of review

We review a district court's grant of summary judgment de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.* 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.  Direct evidence of discrimination

We shall consider Carter's federal and state-law discrimination claims under the Title VII framework because Ohio's requirements are the same as under federal law. *See Ohio Civil Rights Comm'n v. Ingram*, 630 N.E.2d 669, 674 (Ohio 1994). To establish a Title VII employment

discrimination claim, Carter was required to either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). Carter argues that the alleged comments made by Murry constitute direct evidence of discrimination. She points to three comments purportedly made by him: (1) that Czerniak was "trying to whitewash the College of Education" faculty, (2) that Murry was struggling with Czerniak to appoint African-American professors, and (3) that "the decision-makers at the College of Education are a bunch of racists."

The district court began its analysis by considering whether or not Carter would be allowed to testify as to these comments allegedly made by Murry. We do not need to address this evidentiary issue with regard to our analysis of the direct-evidence argument, however, because even if Murry's comments are admissible as nonhearsay, they do not constitute direct evidence of discrimination against Carter under controlling Sixth Circuit precedent.

This court has held that comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination. *See Hopson v. DaimlerChrysler Corp.,* 306 F.3d 427, 433 (6th Cir. 2002) (holding that a company manager's opinion that "race was a factor" in the company's decision not to promote the plaintiff was not direct evidence for purposes of the plaintiff's discrimination claim because the manager had "no involvement in the decision-making process with respect to the particular jobs at issue"). Murry was not a decision-maker with regard to the renewal of Carter's visiting professorship. His statements therefore cannot be considered direct evidence of racial discrimination against Carter.

## C.  Circumstantial evidence

Where a plaintiff fails to present direct evidence of discrimination, the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), applies. *Johnson*, 319 F.3d at 865-66.  The plaintiff must first present a prima facie case of discrimination. *Id.* at 866.  Establishing a prima facie case creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action. *Id.*  If the defendant satisfies this burden, the plaintiff "must then prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.* (internal citation omitted).

To establish a prima facie case of discrimination, a plaintiff must show that (1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class. *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 349 (6th Cir. 1997). The University does not dispute that Carter could establish a prima facie case of race discrimination.

In response, however, the University offered the following "legitimate, nondiscriminatory reasons" for not retaining Carter as a visiting professor:

1.  Carter did not apply for a regular tenure track faculty position in the EDAS program when one was advertised in 2000.

2.  Carter, whose regional educational experience was based upon her work in Michigan, did not have the appropriate Ohio connections to aid in University recruiting.

3.  Carter spent approximately half of her time in the 1999-2000 academic year providing consulting services to the operators of charter schools in Detroit.

4.  Carter was occasionally unavailable to students due to her charter school activities.

The burden thus shifted back to Carter to show that the University's  reasons were pretextual. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508 (1993).  Determining whether the reasons proffered by an employer are pretextual requires a heightened examination of "the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *Id.* at 516.  To demonstrate pretext, a plaintiff may show that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003) (internal citations omitted).

Carter puts forth two arguments as to why the University's proffered reasons for not renewing her contract "did not actually motivate the defendant's challenged conduct." *See id.* First, she contends that Murry's alleged comments concerning the "bunch of racists" at the University and Czerniak's purported attempt to "whitewash the faculty" show that the above reasons were pretextual.  Second, Carter points out that two similarly situated Caucasian visiting professors in the EDAS program had their contracts renewed.

Carter's stronger argument is that Murry's alleged comments demonstrate that the University's proffered reasons did not actually motivate its conduct.  To analyze Carter's argument on this point, we must decide whether Carter would be allowed to testify at trial regarding Murry's alleged comments.  If the comments are deemed to be hearsay, then the evidence could not be considered on summary judgment. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales*

*Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment."). Whether the proffered evidence is hearsay under the Federal Rules of Evidence is a question of law that we review de novo. *Id.*

The district court found that Murry's alleged comments as offered by Carter in her deposition were admissible as nonhearsay under Rule 801(d)(2)(D) of the Federal Rules of Evidence. This rule provides, in relevant part, that a "statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Although the district court concluded that the alleged comments would be admissible as nonhearsay, it reasoned that the purported remarks were too isolated to show pretext on the part of the University.

The University defends the district court's basis for discounting the proffered testimony, but also argues that the alleged comments do not satisfy the requirements of Rule 801(d)(2)(D) because "[t]he record is clear that Murry had nothing to do with the College of Education's substantive decisions regarding the hiring and retention of visiting professors." Its position appears to be that only statements made by declarants who are direct decision-makers concerning the adverse employment action at issue can qualify as nonhearsay under Rule 801(d)(2)(D).

The University cites *Hill v. Spiegel, Inc.*, 708 F.2d 233 (6th Cir. 1983), to support its argument. In *Hill*, the court discussed the application of Rule 801(d)(2)(D) in an age discrimination case. Spiegel, the well-known mail order company, had terminated Emery Hill, who was 56 years old at the time and a regional manager of Spiegel's catalog-order division. In appealing an adverse jury verdict against it, Spiegel argued that the admission of testimony given by Matthew Baker was erroneous. Baker, a former district manager at Spiegel, testified on Hill's behalf to conversations

that he had had with other Spiegel employees about Hill's termination. According to Baker, three Spiegel employees told him that Hill had been discharged because of his age. The court held that "there was no basis for finding that the statements of these declarants concerned 'a matter within the scope of [their] agency,'" reasoning that there was no evidence that any of the declarants were involved in the decision to terminate Hill. *Id.* at 237 (alteration in original).

At first glance the holding appears to support the University's argument that only comments by direct decision-makers can qualify as nonhearsay under Rule 801(d)(2)(D). The court's analysis, however, went beyond the simple question of whether the declarants were direct decision-makers. It looked to the scope of each declarant's employment and noted that there was one "about whose duties and responsibilities [the plaintiff] testified he was uncertain," a second who became a regional manager of Spiegel's catalog order division *after* Hill was discharged, and a third whose job was unrelated to Hill's. *Id.* The court concluded that "[t]he mere fact that each of these men was a 'manager' within the expansive Spiegel organization is clearly insufficient to establish that matters bearing upon Hill's discharge were within the scope of their employment." *Id.* Whether a statement qualifies as nonhearsay under Rule 801(d)(2)(D), therefore, goes beyond simply determining if the declarant is a direct decision-maker with regard to the adverse employment action.

In addition to *Hill*, two other Sixth Circuit cases support this broader reading of Rule 801(d)(2)(D). This court rejected an employer's argument that statements made by someone who was not a direct decision-maker were irrelevant in *Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir. 2003). The court reasoned that "[a]lthough remarks made by an individual who has no authority over the challenged employment action are not indicative of discriminatory intent, the statements of managerial-level employees who have the ability to influence a personnel decision are relevant." *Id.*

And in *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999), this court considered whether the declarant was "involved in any of the critical appraisals of [plaintiff's] performance that preceded her leaving work,"—not whether the declarant was a direct decision-maker—in determining if the declarant's remarks qualified as nonhearsay under Rule 801(d)(2)(D). Being a direct decision-maker, of course, constitutes strong proof that a statement was made within the scope of employment, but the "scope of employment" criterion extends beyond direct decision-makers.

We also note that our prior decisions are consistent with the reasoning of the Seventh Circuit in *Williams v. Pharmacia, Inc.*, 137 F.3d 944 (7th Cir. 1998), where the court rejected the employer's argument that

> an employee's statement regarding a particular action of the employer qualifies as a vicarious admission under Rule 801 only if the employee-declarant was involved in the decisionmaking process leading up to the employer's action. . . . The precise reach of Rule 801(d)(2)(D) is sometimes difficult to discern, as there has been considerable debate about the justification for classifying various admissions as non-hearsay. We are reluctant to follow [the employer's] suggestion and read into the rule a generalized personal involvement requirement, especially in light of the Advisory Committee's admonition that the freedom which admissions have enjoyed . . . from the restrictive influences of . . . the rule requiring firsthand knowledge . . . calls for generous treatment of this avenue to admissibility.

*Id.* at 950 (quotation marks and internal citations omitted).

The district court distinguished *Hill* from the instant case by reasoning that "[a]lthough Murry did not have direct authority to decide whether Carter's appointment was renewed, his oversight of the affirmative action process at the

University places his statements concerning the racial composition of the workforce within the ambit of his authority." Indeed, Murry testified that he ensures that the deans comply with affirmative action requirements when hiring faculty. We agree with the district court's analysis on this point and conclude that because Carter has shown that Murry's comments were within the scope of his employment, Murry's alleged comments are admissible nonhearsay. Fed. R. Evid. 801(d)(2)(D).

We are thus left with the question of whether the district court erred in discounting Murry's alleged comments because they were "isolated." *See, e.g., Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998) ("Isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.") (internal quotation marks and citations omitted). The district court gave no explanation for its conclusion on this point, and we respectfully disagree that the alleged comments can be so categorized. They were allegedly made in direct response to Carter's inquiries as to why she was not rehired. Under these circumstances, we find no justification to regard them as isolated.

In sum, we conclude that a genuine issue of material fact exists as to whether Carter can show pretext on the part of the University. We recognize that, but for Murry's alleged comments, Carter's claims would not likely survive summary judgment. But if the jury were to believe that Murry in fact made the remarks attributed to him, then they might find that the University's proffered reasons "did not actually motivate the defendant's challenged conduct." *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003). This is a credibility determination that must be resolved by the factfinder, not by the court as a matter of law. We therefore conclude that the district court erred in granting the University's motion for summary judgment.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the district court's grant of summary judgment in favor of the University and **REMAND** for further proceedings consistent with this opinion.